# STATE OF MICHIGAN

# COURT OF APPEALS

JAIME SHAYA,

        Plaintiff-Appellee,

v

MAZIN SHAYA,

        Defendant-Appellant.

UNPUBLISHED
August 9, 2018

No. 336107
Wayne Circuit Court
LC No. 15-102203-DM

Before: RIORDAN, P.J., and K. F. KELLY and BOONSTRA, JJ.

PER CURIAM.

In this divorce action, defendant appeals as of right the judgment of divorce entered after a bench trial. We affirm but remand for the ministerial task of correcting the judgment in accordance with this opinion.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

Defendant and plaintiff were married on January 13, 2009. Over the course of their marriage they had two children together, JNS and JDS. Plaintiff worked for a mutual insurance company, through which she earned a 401K and a salary of $74,901. Defendant worked for his brothers, who owned and operated party stores. Defendant alleged that he only made around $13,000 per year, but noted that his brothers would give him money when he needed it.

Later in 2011, the parties decided to purchase a home in Riverview, Michigan. Plaintiff took a hardship distribution from her 401K for around $39,000 and used around $3,500 from her savings. Defendant contributed $65,000 from lottery winnings he obtained before the marriage, which had been held by his brother. Defendant's mother loaned the couple an additional $20,000, and the parties purchased the home for $127,500 in cash. Later, plaintiff took a $19,000 loan from her 401K to help pay back defendant's mother. Plaintiff paid back the 401K loan through regular withdrawals directly from her paychecks. Throughout the marriage, defendant gambled regularly, although plaintiff was unaware regarding how much defendant spent doing so. Plaintiff also owned property in Cheboygan County, which she purchased with another loan from her 401K before the marriage.

In February of 2015, after several fights that involved allegations of emotional, sexual, and physical abuse committed by defendant, plaintiff filed for divorce. Defendant, maintaining that he only made $13,000 per year, requested spousal support, child support, a portion of

-1-

plaintiff's 401K, and attorney fees. Plaintiff asserted that defendant was lying about his income and presented testimony from an expert witness, Clinton Meyering, that defendant actually made $76,711 per year. Plaintiff argued that, considering their similar incomes and similar investments in the marital home, the trial court should split the value of the home accordingly and deny defendant's requests for spousal support and attorney fees. Plaintiff also requested that defendant be required to pay child support because plaintiff had significantly more overnight visits with the children and that he be denied any portion of her 401K because of his gambling issues. Ultimately, the trial court believed plaintiff and Meyering, while finding defendant's testimony lacking in credibility. Subsequently, the trial court entered a judgment of divorce largely adopting plaintiff's arguments. This appeal followed.

## II. CHILD SUPPORT

Defendant argues that the trial court committed error requiring reversal in calculating child support payments based on a clearly erroneous imputation of income. We disagree.

### A. STANDARD OF REVIEW AND APPLICABLE LAW

"Child support orders and the modification of such orders are reviewed for an abuse of discretion." *Peterson v Peterson*, 272 Mich App 511, 515; 727 NW2d 393 (2006). "An abuse of discretion occurs when the result falls outside the range of principled outcomes." *Richards v Richards*, 310 Mich App 683, 699; 874 NW2d 704 (2015). However, "[w]hether a trial court properly operated within the statutory framework relative to child support calculations and any deviation from the child support formula are reviewed de novo as questions of law." *Peterson*, 272 Mich App at 516. "The trial court's factual findings underlying its determination regarding child support are reviewed for clear error." *Ewald v Ewald*, 292 Mich App 706, 714; 810 NW2d 396 (2011). "A finding is clearly erroneous if we are left with a definite and firm conviction that a mistake has been made." *Richards*, 310 Mich App at 700 (quotation marks omitted).

"A trial court must presumptively follow the MCSF[1] when determining the child support obligation of parents." *Ewald*, 292 Mich App at 714. "[T]he court shall order child support in an amount determined by application of the child support formula developed by the state friend of the court bureau as required in section 19 of the friend of the court act, MCL 552.519." MCL 552.605(2). "A trial court must strictly comply with the requirements of the MCSF in calculating the parents' support obligations unless it 'determines from the facts of the case that application of the child support formula would be unjust or inappropriate . . . .' " *Borowsky v Borowsky*, 273 Mich App 666, 673; 733 NW2d 71 (2007), quoting MCL 552.605(2). "Just as with a statute, courts must comply with the plain language of the MCSF, and may not read language into the MCSF that is not present." *Clarke v Clarke*, 297 Mich App 172, 179; 823 NW2d 318 (2012).

"The first step in determining the parents' support obligation under the MCSF is to determine each parent's net income in order to establish, as accurately as possible, the monies

---

[1] MCSF stands for the Michigan Child Support Formula.

available to support the children." *Borowsky*, 273 Mich App at 673 (quotation marks omitted). See also 2013 MCSF 2.01(B). "The term 'net income' means all income minus the deductions and adjustments permitted by this manual." 2013 MCSF 2.01(A). Under the MCSF, income includes "[w]ages, overtime pay, bonuses or other monies from all employers or as a result of any employment," 2013 MCF 2.01(C)(1), " . . . gambling or lottery winnings to the extent that they represent regular income or may be used to generate regular income," 2013 MCSF 2.01(C)(5), and "the value of gifts or gratuities such as money, food, shelter, transportation, or other goods or services that a parent receives from relatives (other than a spouse), friends, or others," 2013 MCSF 2.05(B). Gifts are only considered income when they are "significant and regularly reduce[] personal expenses, or . . . [r]eplace[] or supplement[] employment income." 2013 MCSF 2.05(B)(1)-(2).

The MCSF provides that the income of an individual often will be hard to calculate due to certain circumstances, including that some people "have types of income and expenses not frequently encountered when determining income for most people." 2013 MCSF 2.01(E)(1)(a). In such situations, when "determin[ing] the monies that a parent has available for support, it may be necessary to examine business tax returns, balance sheets, accounting or banking records, and other business documents to identify any additional monies a parent has available for support that were not included as personal income." 2013 MCSF 2.01(E)(2). "Where income varies considerably year-to-year due to the nature of the parent's work, use three years' information to determine that parents' income." 2013 MCSF 2.02(B).

## B. ANALYSIS

Defendant argues that the trial court erred by finding that he had an income of $76,711 per year based largely on the testimony of Meyering. Defendant's reasoning relies primarily on an allegation that Meyering's calculations were improper. As noted, the MCSF acknowledges that sometimes a parent's income will be difficult to calculate. 2013 MCSF 2.01(E)(1)(a). In such situations, a trial court is permitted to rely on "business tax returns, balance sheets, accounting or banking records, and other business documents to identify any additional monies a parent has available for support that were not included as personal income." 2013 MCSF 2.01(E)(2). In the instant case, Meyering relied on two basic principles for calculating defendant's income: (1) Money deposited in his bank account was earned, and (2) in order to lose money gambling or playing the lottery, that money must have been earned. In doing so, Meyering used defendant's tax returns, bank statements, and a report generated by MGM Grand Casino regarding his gambling wins and losses. Meyering analyzed defendant's tax returns to reveal how much lottery winnings he claimed and then used that amount, combined with historical data regarding winning rates, to calculate how much defendant lost playing the lottery. Meyering reviewed defendant's MGM Grand statement to observe defendant's losses at that casino, which, after correcting for ATM activity at MGM Grand, he used those losses as income. Finally, Meyering identified all the deposits made to defendant's bank account, which he counted as income. Having reviewed the record, all of the data relied on by Meyering was fully supported by admitted evidence including defendant's tax returns, bank statements, and the MGM Casino report.

Defendant's argument, however, relies on attacking Meyering's calculations rather than the data he relied on. First, defendant asserts that the trial court clearly erred in relying on

-3-

Meyering's calculations because he applied an historical ratio of win and loss percentages with respect to the Michigan Lottery and used the MGM Casino records as written, even though defendant clearly testified that most of the losses on the MGM account were accrued by his friends and that he always won more than he lost while playing the lottery. Defendant relies only on his own testimony to establish those arguments, but the trial court explicitly stated that it did not believe defendant's testimony. Thus, in essence, defendant is asking us to find that the trial court clearly erred because it believed historical data, a report prepared by a casino, and Meyering's analysis thereof, instead of defendant's testimony to the contrary. "To the extent a factual determination turns on the credibility of a witness, this Court generally defers to the trial court." *Andrusz v Andrusz*, 320 Mich App 445, 455; 904 NW2d 636 (2017). Consequently, because Meyering's calculations were supported by admissible evidence, which the MCSF suggests should be relied on in analyzing difficult to calculate income, 2013 MCSF 2.01(E)(2), and the trial court clearly stated that it did not find defendant's testimony to the contrary credible, this argument by defendant is without merit. *Andrusz*, 320 Mich App at 455; *Ewald*, 292 Mich App at 714.

Defendant also contends that Meyering's algorithm was flawed because it double-counted certain deposits in his bank account and his lottery winnings. In support of that argument, defendant directed the trial court and this Court to evidence that he made some sizeable deposits to his bank account at around the same time he won money from the lottery. Defendant argues that by counting those deposits as one form of income, and relying on his lottery winnings to calculate his lottery losses and use that as another form of income, was a form of double-counting his income. Defendant's argument is logical, but once again, ultimately relies on a credibility determination. In pertinent part, defendant's assertion required the trial court to believe that defendant deposited his lottery winnings into his bank account. Indeed, he testified that he did so. However, defendant also testified that when he won money playing the lottery, he would regularly use those winnings to play the lottery more. Further, defendant testified that, in other circumstances, he would have family members cash his winning tickets, and then give him that money later in cash. Therefore, it stands to reason that when defendant won at the lottery, the money very rarely, if ever, made its way to his bank account. The trial court specifically stated in its findings of fact that it believed defendant was a compulsive gambler and lied about it to hide his true income. Thus, logic suggests that the trial court acknowledged defendant's argument regarding Meyering's double-counting, but merely did not believe it, because the trial court did not believe that defendant actually deposited any lottery winnings in his bank account. To have done so would have been contrary to almost all of the evidence introduced in the case that clearly showed defendant's ultimate intent to shield his income from the IRS, the trial court, and plaintiff. The trial court believed that evidence and not defendant's testimony that he deposited his lottery winnings into his bank account. Once again, because the trial court's decision relied on a credibility determination, we will defer to the trial court's factual finding. *Andrusz*, 320 Mich App at 455.

In sum, Meyering's calculation of defendant's income at $76,711 was supported by the record and the trial court did not clearly err in adopting that as defendant's actual income. Defendant points out, however, that the trial court ruled that it had *imputed* that income to defendant, not that it was defendant's actual income. Thus, defendant contends that the trial court committed legal error by imputing income to him without citing and discussing the required factors under the MCSF. Defendant's argument primarily relies upon 2013 MCSF

2.01(G), which provides that "[w]hen a parent is voluntarily unemployed or underemployed, or has an unexercised ability to earn, income includes the potential income that parent could earn, subject to that parent's actual ability." In determining imputed income, a trial court is to consider the 11 factors listed at 2013 MCSF 2.01(G)(2). "These factors generally ensure that adequate fact-finding supports the conclusion that the parent to whom income is imputed has an actual ability and likelihood of earning the imputed income." *Clarke*, 297 Mich App at 184, quoting *Berger v Berger*, 277 Mich App 700, 725-726; 747 NW2d 336 (2008).

This case presents a bizarre confluence of procedural occurrences. At trial, Meyering provided specific testimony regarding defendant's *actual* income. Meyering's testimony was unrelated to income defendant could be earning but was voluntarily avoiding. To wit, Meyering's testimony relied on money that defendant actually deposited in his account and spent on gambling. Thus, he must have *actually* earned it to have spent it. Nevertheless, after trial but before the judgment of divorce was issued, defendant requested that the trial court clarify whether it was imputing income to defendant or calculating his actual income. During the hearing regarding that issue, the trial court initially stated that it was calculating defendant's actual income. Plaintiff argued to the contrary, stating that the trial court was imputing income to defendant because defendant never admitted that he made $76,711. Plaintiff insisted that if the trial court were to say that it was calculating actual income, defendant would merely come back to court in a few months and allege that his income had changed. Imputing income, according to plaintiff, would discourage defendant from attempting to do so. In response to that argument, the trial court took the issue under advisement, and later issued an order specifically ruling that it was imputing income to defendant. The trial court then included that language in the judgment of divorce. Confusingly, now on appeal, plaintiff argues that the trial court actually was calculating defendant's actual income.

Plaintiff's argument on appeal that the trial court was not "imputing" income to defendant based on voluntary unemployment or underemployment, but instead, merely was attempting to determine defendant's *actual* income is correct. Importantly, the trial court found that defendant actually was earning $76,711 per year, not that he could be but was voluntarily refusing to do so. The distinction is important because 2013 MCSF 2.01(G) only applies to the imputation of income. Thus, the factors found in subsection (G)(2) were irrelevant in the present case and the trial court did not have to consider them. See *Clarke*, 297 Mich App at 184.

However, we are still presented with a record where the trial court specifically ruled that it was imputing income to defendant and then failed to cite the necessary factors in the MCSF. To impute income to defendant in the first place clearly was error because all of the testimony at trial was not regarding defendant's voluntarily reduced income, but the income he actually was earning. "However, '[a] trial court's ruling may be upheld on appeal where the right result issued, albeit for the wrong reason.'" *Southfield Ed Ass'n v Bd of Ed of Southfield Pub Sch*, 320 Mich App 353, 374; 909 NW2d 1 (2017), quoting *Gleason v Dep't of Transp*, 256 Mich App 1, 3; 662 NW2d 822 (2003). Further, "an error in anything done or omitted by the court or by the parties is not ground for . . . vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court to be inconsistent with substantial justice." MCR 2.613(A). An error is "inconsistent with substantial justice" when it prejudices a party. See *Estate of Jilek v Stockson*, 490 Mich 961, 962; 805 NW2d 852 (2011). As discussed in depth, *supra*, the trial court did not clearly err in calculating defendant's income. Therefore,

using $76,711 to formulate the appropriate child support payment was the correct result in this case and did not cause defendant prejudice. However, in stating that it was *imputing* that income to defendant, the trial court announced the wrong reason for its correct decision. Consequently, because the trial court reached the right result for the wrong reason, we affirm, but remand for the ministerial task of correcting the judgment of divorce to reflect that defendant's actual income was calculated instead of imputed. See *Southfield Ed Ass'n*, 320 Mich App at 374. MCR 2.613(A).

Defendant also argues that the trial court committed legal error by taking into account more than three years of defendant's alleged income, contrary to 2013 MCSF 2.02(B). That section, however, is limited to situations where a parent's "income varies considerably year-to-year due to the nature of the parent's work . . . ." *Id*. However, the trial court never found that defendant's income changed from year-to-year, only that defendant took various steps to hide his income, making it difficult to discover. In such situations, the MCSF is clear that the parent's historical income, based on patterns therein, is an important factor to consider. See *Diez v Davey*, 307 Mich App 366, 379; 861 NW2d 323 (2014) ("When undertaking this analysis, which must necessarily be undertaken on a case-by-case basis, it is apparent from the MCSF that a parent's historical business practices should be given considerable weight in assessing the parent's income from a business."). Therefore, the trial court did not violate the MCSF by relying on Meyering's review of defendant's income for more than three years, but rather, was relying on the guidance of the MCSF in attempting to discover defendant's actual income by reviewing patterns in defendant's historical income. See *id*.

In sum, the trial court properly calculated defendant's income, despite stating that it was imputed, and thus, properly calculated defendant's child support payment.

## III. DISTRIBUTION OF MARITAL ESTATE

Defendant argues that the trial court's distribution of the marital estate was inequitable. We disagree.

## A. STANDARD OF REVIEW AND APPLICABLE LAW

"We consider 'the trial court's findings of fact under the clearly erroneous standard. If the findings of fact are upheld, [we] must decide whether the dispositive ruling was fair and equitable in light of those facts.' " *Richards*, 310 Mich App at 693, quoting *Sparks v Sparks*, 440 Mich 141, 151-152; 485 NW2d 893 (1992). "The trial court's dispositional ruling will be upheld, unless this Court is 'left with the firm conviction that the division was inequitable.' " *Richards*, 310 Mich App at 694, quoting *Sparks*, 440 Mich at 152.

"The goal behind dividing marital property is to reach an equitable distribution in light of all the circumstances." *Washington v Washington*, 283 Mich App 667, 673; 770 NW2d 908 (2009). In other words, "[a]lthough marital property need not be divided equally, it must be divided equitably in light of a court's evaluation of the parties' contributions, faults and needs." *Richards*, 310 Mich App at 694. The Michigan Supreme Court provided a list of factors "to be considered wherever they are relevant to the circumstances of the particular case:"

(1) duration of the marriage, (2) contributions of the parties to the marital estate, (3) age of the parties, (4) health of the parties, (5) life status of the parties, (6) necessities and circumstances of the parties, (7) earning abilities of the parties, (8) past relations and conduct of the parties, and (9) general principles of equity. [*Sparks*, 440 Mich at 159-160.]

"When dividing marital property, a trial court may also consider additional factors that are relevant to a particular case," and "[t]he trial court must consider all relevant factors but not assign disproportionate weight to any one circumstance." *Berger*, 277 Mich App at 717 (quotation marks omitted). "And, as a corollary to that, there is no Michigan statute or caselaw that precludes outright a substantial deviation from numerical equality in a property distribution award." *Washington*, 283 Mich App at 673. "In addition, this Court defers to a trial court's findings of fact stemming from credibility determinations." *Richards*, 310 Mich App at 694.

## B. ANALYSIS

Defendant first asserts that the trial court clearly erred in finding that the parties each contributed approximately an equal amount to the purchase of the marital home. Defendant claims that the trial court should have counted the $20,000 loan from his mother as a contribution from defendant, not plaintiff. However, defendant relies only on his own testimony to establish the alleged error, while refusing to acknowledge that plaintiff testified that she took a loan from her 401K to pay back the loan from defendant's mother. Plaintiff presented documentation that she borrowed from her 401K and Meyering testified that the financial records convinced him that plaintiff did indeed pay back the $20,000 loan. In making its decision, the trial court stated that it found plaintiff's and Meyering's testimony convincing and defendant's credibility to be lacking. Relying on those determinations, the trial court found that plaintiff paid back the loan, so the $20,000 counted as her contribution to the purchase of the marital home. This resulted in plaintiff contributing $62,500 and defendant contributing $65,000 toward the purchase of the marital home. Because that decision relied on admissible evidence and the trial court's credibility determinations, we defer to the trial court. *Id.* Therefore, the trial court did not clearly err in finding that plaintiff contributed about half of the funds for the marital home, and consequently, did not make an inequitable distribution in ordering the house to be split equally. See *id.*; see also *Washington*, 283 Mich App at 673.

Defendant next argues that the trial court failed to consider that he contributed to the Cheboygan property, so it should have been considered a marital asset. Specifically, defendant argues that the trial court failed to credit defendant's testimony that he paid the property taxes for the Cheboygan property and paid all of the bills allowing plaintiff to pay off her loan used to purchase the property. "Generally, marital property is that which is acquired or earned during the marriage, whereas separate property is that which is obtained or earned before the marriage." *Cunningham v Cunningham*, 289 Mich App 195, 201; 795 NW2d 826 (2010). However, "separate assets may lose their character as separate property and transform into marital property if they are commingled with marital assets and treated by the parties as marital property." *Id.* (quotation marks omitted). In this case, plaintiff introduced evidence that she purchased the Cheboygan property before she and defendant were married, by taking a loan from her 401K. Plaintiff then paid off the loan by direct withdrawal from her paycheck. It is undisputed that defendant never paid any portion of the purchase price of the property. Thus, the trial court did

not err in determining that the property was separate property because it was "obtained or earned before the marriage." *Id*. The trial court also did not clearly err in determining that the Cheboygan property had not been transformed into marital property. While defendant testified that he paid bills to allow plaintiff to pay off her 401K loan, the trial court noted that testimony and found it to be untrue. The trial court's determination was supported by plaintiff's testimony and documentation that she bought the house with a 401K loan and then paid it off with direct withdrawals from her paycheck. Considering those direct withdrawals, which were agreed to and initiated before the marriage, it was not improper for the trial court to assume that defendant's paying of the bills during the marriage did not contribute to plaintiff's ability to pay off her 401K loan. Further, evidence establishing that defendant paid the taxes on the Cheboygan property once or twice, which was not contradicted by plaintiff, does not undermine the trial court's decision that the Cheboygan real estate remained separate property. After all, the inquiry is not whether a party contributed a single payment for taxes on a piece of property, but whether it was commingled or treated as a marital asset. Plaintiff's testimony that defendant almost never visited the property and told her to sell it on multiple occasions, which she refused, supports that defendant and plaintiff did not consider the property to be marital. Therefore, the trial court did not clearly err in determining that the Cheboygan property was plaintiff's separate asset and not subject to the distribution of the marital estate. See *id*.

Lastly, defendant contends that the trial court committed error requiring reversal by refusing to award him any portion of plaintiff's 401K that accrued during the marriage. The trial court record supports that around $50,000 of plaintiff's 401K accrued during the marriage. In denying defendant's request for half of that amount, the trial court relied on defendant's gambling during the marriage. "[F]ault is clearly a proper factor to consider in the division of marital property." *Washington*, 283 Mich App at 675-676. "[T]he concept of fault," however, should not be given "disproportionate weight." *McDougal v McDougal*, 451 Mich 80, 89; 545 NW2d 357 (1996). The ultimate goal "is to achieve equity, not to punish one of the parties." *Id*. at 90 (quotation marks omitted). Fault is particularly relevant "in a case like this where . . . the fault was directly related to the parties' assets and debts." *Washington*, 283 Mich App at 676.

Testimony from Meyering and the documentation on which he relied led to the conclusion that defendant lost around $30,000 per year on gambling and playing the lottery. Indeed, Meyering noted that it likely was more than that because he did not consider defendant's losses at the Motor City Casino. Plaintiff, meanwhile, presented abundant testimony that defendant compulsively gambled, and provided documentary evidence showing that defendant spent around $10,000 gambling while on a cruise. Thus, it is reasonable to assume that over the course of the six-year marriage defendant gambled away more than $180,000 of the marital estate. In light of these circumstances, the trial court properly found that it would be inequitable to allow defendant to have a portion of plaintiff's retirement fund. Indeed in *Washington*, this Court upheld a facially unequal distribution of an entire marital estate. See *id*. Further, this Court has been clear that an equitable distribution does not necessarily mean an equal distribution. *Richards*, 310 Mich App at 694. Denying defendant access to around $25,000 of plaintiff's 401K is minor compared to the hundreds of thousands of dollars defendant spent gambling during the marriage. Consequently, even though the distribution of plaintiff's 401K was not *equal*, it was *equitable*. See *Richards*, 310 Mich App at 694; see also *Washington*, 283 Mich App at 675-676.

In sum, defendant's arguments that the distribution was inequitable are without merit.

## IV. ATTORNEY FEES

Defendant argues that the trial court abused its discretion in denying his request for attorney fees and ordering him to pay those attorney fees of plaintiff related to hiring Meyering. We disagree.

### A. STANDARD OF REVIEW AND APPLICABLE LAW

"This Court reviews a trial court's decision to award attorney fees in a divorce action for an abuse of discretion." *Woodington v Shokoohi*, 288 Mich App 352, 369; 792 NW2d 63 (2010). "An abuse of discretion occurs when the result falls outside the range of principled outcomes." *Richards*, 310 Mich App at 699. "The findings of fact on which the trial court bases its decision are reviewed for clear error." *Woodington*, 288 Mich App at 369. "A finding is clearly erroneous if we are left with a definite and firm conviction that a mistake has been made." *Richards*, 310 Mich App at 700 (quotation marks omitted).

"Under the 'American rule,' attorney fees are not recoverable as an element of costs or damages unless expressly allowed by statute, court rule, common-law exception, or contract." *Reed v Reed*, 265 Mich App 131, 164; 693 NW2d 825 (2005). "In domestic relations cases, attorney fees are authorized by both statute, MCL 552.13, and court rule, MCR 3.206(C)." *Reed*, 265 Mich App at 164. "A party to a divorce action may be ordered to pay the other party's reasonable attorney fees if the record supports a finding that such financial assistance is necessary to enable the other party to defend or prosecute the action." *Borowsky*, 273 Mich App at 687, quoting *Stackhouse v Stackhouse*, 193 Mich App 437, 445; 484 NW2d 723 (1992). "Either by statute or court rule, attorney fees in a divorce action may be awarded only when a party needs financial assistance to prosecute or defend the suit." *Reed*, 265 Mich App at 164. There also is a common law exception to the "American rule," authorizing "[a]n award of legal fees . . . where the party requesting the fees has been forced to incur them as a result of the other party's unreasonable conduct." *Borowsky*, 273 Mich App at 687. See also *Reed*, 265 Mich App at 164-165. In either case, "[t]he party requesting the attorney fees has the burden of showing facts sufficient to justify the award." *Borowsky*, 273 Mich App at 687.

### B. ANALYSIS

Defendant's primary argument is that plaintiff should have been required to pay his attorney fees because she made a great deal more money than he did and he could not afford an attorney. However, as discussed *supra*, the trial court calculated defendant's actual income at almost the same level as plaintiff's income. While defendant once again contends that this income was miscalculated for a variety of reasons, none of those arguments have merit. As discussed *supra*, the trial court did not clearly err in calculating defendant's income at $76,711, and the calculation of plaintiff's income at $74,901 is not disputed. Therefore, considering that plaintiff and defendant earned a similar salary, there was no evidence that defendant needed "financial assistance to prosecute or defend the suit." *Reed*, 265 Mich App at 164. Consequently, the trial court did not abuse its discretion in deciding that each party would pay

for their own attorney fees. See *Woodington*, 288 Mich App at 369; see also *Borowsky*, 273 Mich App at 687.

As a secondary argument, defendant contends that the trial court abused its discretion by ordering him to pay all attorney fees arising out of Meyering's testimony. As noted, a trial court is permitted to order one party to pay for the attorney fees of another party "where the party requesting the fees has been forced to incur them as a result of the other party's unreasonable conduct." *Borowsky*, 273 Mich App at 687. The trial court found that defendant lied about his income and gambling problems to shield his actual earnings. Defendant's unreasonable act of shielding his income caused plaintiff to obtain the assistance of an expert witness to determine how much money defendant actually earned. Had defendant provided truthful testimony and documentation regarding his income, Meyering's testimony would not have been necessary. Thus, according to the standard in *Borowsky*, the trial court did not abuse its discretion in ordering defendant to pay for the attorney fees arising out of Meyering's testimony. See *id*.

Affirmed and remanded. We do not retain jurisdiction.

/s/ Michael J. Riordan
/s/ Kirsten Frank Kelly
/s/ Mark T. Boonstra